# United States Court of Appeals
## For the First Circuit

No. 13-2204

UNITED STATES OF AMERICA,

Appellee,

v.

VICTOR MANUEL FELIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Barry S. Pollack, with whom Pollack Solomon Duffy LLP was on brief, for appellant.
María L. Montañez-Concepción, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

July 16, 2015

**LYNCH**, **Circuit Judge**.  At issue are the proper procedures for determining whether a confession is voluntary under Jackson v. Denno, 378 U.S. 368 (1964).  The procedure followed by the trial court was based on an error, so we vacate the defendant's conviction and remand for further proceedings consistent with this opinion.  See Sims v. Georgia, 385 U.S. 538, 544 (1967).  Although issues under Miranda v. Arizona, 384 U.S. 436 (1966), existed earlier, they are not raised in this appeal.

Victor Feliz, a youth with no prior record, was convicted in December 2012 of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  His conviction was based largely on two written confessions.  Before trial, Feliz moved to suppress the confessions as involuntary, being induced by threats made to him as to repercussions to his mother and his young siblings if he did not confess.

The magistrate judge heard testimony from two police officers that the confessions were freely made, and, contrarily, from Feliz and his mother that the government had dictated to him his confessions, which he signed, after officers threatened his mother with deportation and his siblings with being put into state

custody. The magistrate judge recommended that the confessions be suppressed as involuntary. As relevant here, the government filed objections as to the magistrate judge's factual finding that the statements were dictated and the conclusion that the statements were involuntary.

The district court conducted a de novo hearing. There, the district court excluded the defense testimony about the circumstances of the confessions involving police pressure as hearsay. It then made a series of ambiguous statements to the effect that any issue about credibility going to the voluntariness of a confession was for the jury, not for the judge, to decide. Then, about two months later, it directly ruled and stated that it admitted the confessions into evidence, because, in its view, the record before it contained no evidence of coercion (having excluded that evidence on hearsay grounds). On review, we cannot conclude that the confessions were voluntary, because the district court erroneously excluded from consideration the critical evidence to the contrary. We vacate and remand.[1]

---

[1] In light of this disposition, we do not reach Feliz's claim of sentencing error.

I.

A. Factual Background

On February 3, 2012, at 5:45 a.m., Puerto Rico police executed a search warrant[2] at a home in Dorado, Puerto Rico. Five officers arrived at the house, where they found Feliz's mother, stepfather, minor sisters, and infant brother. Feliz himself, an eighteen-year-old with no criminal record, was not present. Feliz's stepfather Luis Rivera, the owner of the house, identified the bedroom in which Feliz had last stayed. The officers testified that they found a loaded pistol, more ammunition, eighty-seven capsules of cocaine base, and $1,384 in cash in the bedroom. They arrested Rivera, Feliz's stepfather, for possessing a firearm without a license. They then transported Rivera and the rest of the family, including the two-year-old infant, to the police station.

At this point, the accounts of the police officers and Feliz's family diverge. According to the police officers, as the

_____

[2] The search warrant was based on a tip from an informant and subsequent observation of Feliz at the home by Puerto Rico police officers. In the district court, Feliz sought a Franks hearing, arguing that the affidavit accompanying the search warrant contained material facts that were false or made with reckless disregard for their truth. See Franks v. Delaware, 438 U.S. 154 (1978). The district court denied the motion on September 15, 2012, and Feliz has not appealed that decision.

officers got into their patrol cars, Feliz appeared and approached the house.  One of the officers, Agent José Vélez, left his car, gave Feliz a Miranda warning, arrested him, and drove him to the police station.  At the station, Agent Vélez again gave Feliz the Miranda warnings, this time verbally and in writing.  Feliz signed that he understood his Miranda rights, and then, around 7:30 a.m., the police say he wrote a confession on the reverse side of the Miranda form.  The confession stated that Feliz owned the gun, drugs, and money, and that his family did not know of them.  Feliz also signed a property seizure form.

The police officers say they then took Feliz to the office of the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) in San Juan for DNA testing.  Agent José López, an officer of the Puerto Rico police participating in an ATF task force, conducted the testing.  Feliz began crying and confessing again. Agent López immediately gave Feliz a verbal Miranda warning, told Feliz to stop, and had Feliz read and sign a written Miranda form. Feliz then again wrote a confession on the reverse side of the Miranda form, around 2:30 p.m.  This second, more detailed confession explained that Feliz obtained the firearm for protection while selling drugs, and that he began selling drugs to provide for his ten-month-old son while Feliz was unemployed.

- 5 -

Feliz and his mother, Hortencia Feliz, recounted a different tale. According to them, after the search of the house, the police officers told Feliz's mother to call Feliz. She did. Feliz missed her call, but soon returned it. One of the officers took the phone from his mother to speak with Feliz. The officer told Feliz to turn himself in, because "all of that" was his. The officer also threatened Feliz that, if he refused to turn himself in, his siblings would be sent to the custody of the Department of Family Affairs. Feliz's mother was audible to Feliz, crying in the background. Hortencia confirmed his account.

Feliz turned himself in to the police at the station, where officers walked him past his family and into an interrogation room. One of the officers told him that if he failed to confess, his mother, a Dominican national, would be deported. Agent Vélez then dictated the first confession to Feliz. After Feliz wrote out the confession, Agent Vélez told Feliz to sign the Miranda form, presenting it as an afterthought and without giving Feliz the opportunity to read it.

Later, in the ATF office's interrogation room, Agent López threatened Feliz that if he did not confess again, his mother would be deported and sisters removed to the custody of the state.

Agent López dictated the second, more detailed confession to Feliz. Feliz signed the second Miranda waiver.

## B. Magistrate Judge Proceedings

The government filed a criminal complaint against Feliz on February 3, 2012, charging him with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1). A grand jury indicted Feliz on the same two counts, along with a forfeiture allegation, on March 1, 2012. Feliz entered a plea of not guilty.

On April 16, 2012, Feliz moved to suppress the Miranda warnings and waiver form, his statements written on the back of those forms, and the evidence seized from his home, which he argued had been planted by the police. The district court referred the motion to a magistrate judge on May 4, 2012.

On June 7, 2012, the magistrate judge held a suppression hearing. Agent Vélez and Agent López testified for the government, and Feliz, Rivera, and Feliz's mother Hortencia testified for the defense. Feliz's sister also testified for the defense, saying that she saw the police officers bring a black bag into the house on the day of the search.

On June 20, 2012, the magistrate judge issued a Report and Recommendation. The judge found that, "after observing their demeanor and noting their consistency, as well as that of the other witnesses," "the testimony of Defendant Feliz and his family members" was credible. The magistrate judge credited that testimony over the testimony of the police officers.

Applying the law to the version of events offered by the Feliz family, the magistrate judge recommended that both confessions be suppressed because neither was made voluntarily. Feliz did not waive his Miranda rights before making the first statement. He also made the statement under "intense psychological pressures": the threatened deportation of his mother and removal of his sisters from their family, and the fact that his entire family was in police custody and at the police station. The second confession was involuntary for the same reasons.

The magistrate judge recommended denial of the motion to suppress the physical evidence, concluding that "whether that evidence was possessed or planted is a question for the jury." However, the judge "doubt[ed] whether Feliz ever possessed any of it." The Feliz family's testimony indicated that Feliz had not lived in the house for months prior to the search, that his younger sister lived in the room at the time of the search, that the agents

- 8 -

"found" the gun in a laundry hamper minutes after entering the home and outside the presence of any of Feliz's family, and that the agents took no photographs of the crime scene and did not test the gun or drugs for fingerprints. Feliz's mother and sister each testified that they saw the police bring a duffle bag into the house.

Feliz did not object to the Report and Recommendation, but the government did on July 3, 2012. The government objected to the factual findings that Feliz's statements were made before he received the Miranda warnings form and simply followed the dictation of the police officers. It also objected to the finding that Feliz did not live at the house in Dorado, Puerto Rico. The government concordantly objected to the conclusion that the confessions were made involuntarily and should be suppressed.

C. District Court Proceedings

The district judge held a de novo hearing on July 6, 2012. The district court heard from Agent Vélez and Agent López, as well as Rivera and, initially, Hortencia. Hortencia began describing the first threat by the agent over the phone to her son, that an officer told Feliz that his siblings were "all going to the Department of the Family." The district court sustained a hearsay objection and cut off the line of questioning. The

- 9 -

district court said, "This is hearsay. . . . [I]f you want that proof to come in, you have to Subpoena the police." The district court rejected defense counsel's attempts to argue that a hearsay exception applied, saying, "If you want all these hearsay statements to come in, you have to Subpoena the police." In its view, the defense should have subpoenaed the police officer who allegedly spoke to Feliz by phone and had not testified at either hearing. The court similarly excluded Hortencia's account of the police officer's dealings with Feliz at the police station as hearsay.

When the defense tried to call Feliz's sister to testify, the government objected on relevance grounds, because her testimony would be relevant to whether the drugs were planted, but not to whether Feliz's statements were voluntary. The district court observed that Feliz did not object to the magistrate judge's decision on the physical evidence. At the conclusion of that colloquy, the district judge said:

> The issue here you are fighting is the statements of the defendant. And the evidence that I am hearing puts the so-called statement of the defendant in the realm of credibility. <u>And if it is in the realm of credibility, this Judge cannot decide it. That is going to belong to the jury.</u> . . . By the evidence I have heard, you can produce seven witnesses here that say, no, he didn't give that

statement. And the United States will produce seven more that say, yes, it is voluntary. . . . <u>I cannot suppress a matter that is in the realm of credibility.</u> (emphases added).

Defense counsel replied, "Then, Judge, at this time we rest and we move forward." Neither Feliz's sister nor Feliz himself testified at the de novo hearing.

The judge immediately concluded: "<u>Well, if that is the case, then the Judge finds that the matter of the statements of the defendants fall in the realm of credibility. And, therefore, they belong to the jury. . . . This doesn't belong to me.</u>" (emphasis added). The judge did not make an express finding at the hearing that the confession was made voluntarily.

The district court then considered Feliz's bail. On June 8, 2012, the magistrate judge had reviewed Feliz's bail and released him on a $10,000 bond. The district court had held a de novo bail hearing on June 20. After hearing more evidence at the suppression hearing, the district court concluded that Feliz should be detained. When discussing the weight of the evidence, the district court said that the confessions seemed "valid because they have too much detail."

On September 15, 2012, the district court entered a written order denying the suppression motion. It stated that "no

evidence was submitted that Feliz was coerced by the state police." Evidence to the contrary on which the magistrate judge relied "was not reiterated in the hearing before the undersigned." The court also noted that the confessions signed by Feliz, including a Miranda warning, were written in his own handwriting, and the second was "replete with details." The court added that phone calls Feliz made from prison suggested a "consciousness of guilt," so it found that "the credibility of the police officers executing the search warrant is . . . much more reliable and trustworthy than Feliz' [sic] mother's and step-father's version of the relevant facts."

Nonetheless, the court continued, "there remains an issue of credibility," so "the Court allows Feliz, if he so chooses, to present the issue of voluntariness of his confession to the jury at trial."

Feliz's jury trial began on December 3, 2012. On December 10, Feliz moved in limine to exclude his confessions. In court the next day, the court began discussing the motion by saying that "whether this was a confession that was coerced or not coerced, that is an issue [] for the jury to decide." Defense counsel explained that he filed the second motion "because the record of the case is not clear as to whether or not [the district

- 12 -

court] actually overturned the report and recommendations, which we understand that [the district court] did, but it is not shown on the record."  The district court replied,

> The Court, I thought, made it very clear that I thought that my impression was that the confession was not coerced, but I think that this is an issue of credibility, which may be repeated to the jury.  All right?  That is my determination. . . . I even made an analysis of certain letters that I thought were repeated constantly in the same fashion, meaning to me that there was no coercion.

At trial, the district court admitted the confessions and instructed the jury to "decide (1) whether Victor Manuel Feliz made the statement[s], and (2) if so, how much weight to give [them]."

On December 18, 2012, the jury convicted Feliz on both counts.  On September 3, 2013, the district court sentenced Feliz to eighty-seven months imprisonment: sixty months on Count 1 and twenty-seven months on Count 2, served consecutively, along with five years of supervised release.  This appeal followed.

## II.

Feliz challenges the district court's denial of his motion to suppress his statements as involuntary.  We review the district court's factual findings and credibility determinations

for clear error, and its conclusions of law de novo. United States v. Awer, 770 F.3d 83, 89 (1st Cir. 2014).

Feliz offers two arguments. First, he argues the district court did not actually decide the voluntariness of the confessions as it was required to do. Second, he argues that the district court's later written voluntariness decision cannot be sustained. Because the district court belatedly did rule the statements were voluntary, we focus ultimately on the second point.

A. Did the District Court Decide the Issue?

The Constitution prohibits admission of a coerced confession to prove a defendant's guilt. United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) (citing Dickerson v. United States, 530 U.S. 428, 433 (2000)); United States v. Faulkingham, 295 F.3d 85, 90 (1st Cir. 2002). Accordingly, in federal courts, trial judges are tasked with determining the voluntariness of a conviction before trial. See 18 U.S.C. § 3501(a); Crane v. Kentucky, 476 U.S. 683, 687-88 (1986); United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011); see also Jackson, 378 U.S. at 376-79. The voluntariness inquiry probes "the physical and psychological environment that yielded the confession," a "purely legal question." Crane, 476 U.S. at 688-89. The trial judge considers "the totality of the circumstances, including both the

- 14 -

nature of the police activity and the defendant's situation" to decide "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." Jacques, 744 F.3d at 809 (citations and internal quotation marks omitted).

This decision is for the judge because a jury "may find it difficult to understand the policy forbidding reliance upon a coerced, but true, confession." Jackson, 378 U.S. at 382. As the Supreme Court has explained, "[t]hat a trustworthy confession must also be voluntary if it is to be used at all, generates natural and potent pressure to find it voluntary." Id. Accordingly, letting a jury make both the voluntariness and credibility findings risks letting "matters pertaining to the defendant's guilt . . . infect the jury's findings of fact bearing upon voluntariness, as well as its conclusion upon that issue itself." Id. at 383; see Lego v. Twomey, 404 U.S. 477, 485 (1972) ("[W]e feared [in Jackson] that the reliability and truthfulness of even coerced confessions could impermissibly influence a jury's judgment as to voluntariness."). The burden of proof is on the prosecution to show by a preponderance of the evidence to the judge that the confession was voluntary. See Lego, 404 U.S. at 489; United States v. Hufstetler, 782 F.3d 19, 22 (1st Cir. 2015).

Once the trial judge renders a "clear-cut determination that the confession . . . was in fact voluntary," the defendant generally retains the freedom to "familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness." Lego 404 U.S. at 483, 486. That is so because the jury is empowered to "assess the truthfulness of confessions," id. at 485 -- their credibility -- as part of their decision on "the ultimate factual issue of the defendant's guilt or innocence." Crane, 476 U.S. at 689; see 18 U.S.C. § 3501(a); Fed. R. Evid. 104(e).

Feliz argues that the district judge never made the required finding of voluntariness, instead deferring the issue for the jury. The government contests Feliz's reading of the record, but it does not argue that such a deferral would be lawful.

The magistrate judge recommended that the district judge find that the confessions were involuntary. The district judge conducted a de novo hearing and exercised his authority to make a de novo determination, as the law permits. See 28 U.S.C. § 636(b)(1); United States v. Lawlor, 406 F.3d 37, 40 (1st Cir. 2005) (citing United States v. Raddatz, 477 U.S. 667, 676 (1980)). At the conclusion of the hearing, the district judge said only that "the matter of the statements of the defendant fall[s] in the

- 16 -

realm of credibility," without making a voluntariness finding. In his written opinion denying the motion to suppress, the district judge concluded that there was no evidence of coercion, but also that "there remains an issue of credibility," so Feliz may "present the issue of the voluntariness of the confession to the jury at trial." The district court only clearly explained that the confessions were voluntary when denying Feliz's motion in limine at trial.

The district court's decisions are not a model of clarity. And we cannot merely extrapolate from the fact that the district court denied the suppression motion: that fact could mean either that the court made the proper voluntariness finding or that the court made no finding and deferred the issue to the jury. Cf. Jackson, 378 U.S. at 378-80. Similarly, while the district court accurately observed that the jury may decide issues of credibility, it also used the term "credibility" to describe its own analysis. Any rule that requires the voluntariness of a confession to be decided by the jury and not the judge when a witness's credibility is at issue is erroneous under Jackson v. Denno.

Only immediately before the opening statements at trial did the district court unequivocally conclude that the confessions

were not coerced -- meaning, presumably, that they were voluntary. But that was enough to provide a sufficiently clear ruling before the opening statements at trial. "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." Sims, 385 U.S. at 544. That ruling came at the defendant's request, and Feliz has not suggested that he was prejudiced in any way by the ambiguity persisting between the September 15, 2012, written order and the December 11, 2012, order at trial.

B. The Trial Judge's Ruling That the Confessions Were Voluntary

"The voluntariness of a defendant's confession is a question of law meriting de novo review." Jacques, 744 F.3d at 809. We bypass the question of whether defendant appropriately preserved his objection to the district court's voluntariness finding; the standards for plain error have been met. The error was obvious; it prejudiced Feliz, since the district court's basis for denying the motion to suppress was that no evidence of coercion was submitted at the de novo hearing; and it seriously impugned the fairness, integrity, or reputation of the proceeding. See United States v. Correa-Osorio, 784 F.3d 11, 17-18 (1st Cir. 2015).

- 18 -

The government argues only in a perfunctory footnote that the confession would be voluntary even under the events as described by Feliz's family. So the voluntariness issue hinges on the record and the explanation provided by the district court.

The district court curtailed the record before it when it excluded as hearsay Hortencia's testimony that she heard a police officer threaten Feliz with the deportation of his mother and state custody for his siblings. The court never evaluated the two competing accounts, because it ruled that only one account was before it.

This was plain error. Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing," and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Feliz did not attempt to introduce testimony of the officers' threats for the truth of the matter asserted. Hortencia testified, for example, that the officer said "your siblings are all going to the Department of Family." Before the magistrate judge, Hortencia testified that an officer said to Feliz, "We are going to deport your mother." She also testified there that the officers told Feliz that if he did not turn himself in, "they were going to deport me and they were going to call the Department of the Family

- 19 -

to take the boy and girls." That testimony would not show that Feliz's siblings would truly be sent to the Department of the Family if he did not turn himself into police custody, or that she would have been deported. Rather, the testimony, if credible, would show the fact that the police officer made the threat to Feliz, a fact within Hortencia's personal knowledge. See Fed. R. Evid. 801(c) advisory committee's note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); United States v. Bowles, 751 F.3d 35, 40 (1st Cir. 2014) (characterizing threats as "verbal acts that are not hearsay" (citing United States v. Diaz, 597 F.3d 56, 65 n.9 (1st Cir. 2010))); United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of . . . threats . . ., rather than for the truth of the matter asserted therein, are not hearsay."); see also United States v. Walker, 665 F.3d 212, 230-31 (1st Cir. 2011).

The government falls back to its misunderstanding of the hornbook rule of evidence that an out-of-court statement may be offered to "show the effect of the words spoken on the listener." See United States v. Bailey, 270 F.3d 83, 87 (1st Cir. 2001) (citing 5 Weinstein's Federal Evidence § 801.03[4] (2d ed. 1999)).

Since Hortencia was not the intended recipient of the threat, the argument goes, she could not testify to it.

That is incorrect. The testimony here was offered to show the effect of the words spoken on the listener, Feliz. Even though Hortencia was not the target of the threat, she could still testify that the officer made the threatening statement and it was heard by Feliz. The factfinder can then infer the effect on Feliz from that testimony. See, e.g., Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 379 (6th Cir. 2009); United States v. Lambinus, 747 F.2d 592, 597 (10th Cir. 1984); United States v. Cline, 570 F.2d 731, 734-35 (8th Cir. 1978). The government offers no case -- and we are aware of none -- suggesting that only the listener (and not an independent over-hearer of a conversation) may testify to an out-of-court statement that is relevant to the listener's state of mind. In any event, the formulation "effect of the words on the listener" is not a rigid hearsay exception, but an example of a "more common type[] of nonhearsay utterance[]." 2 McCormick on Evidence § 249 (7th ed. 2013). As we have already explained, this statement is a nonhearsay utterance because it is not being used to prove the truth of the matter asserted.[3]

_____

[3] There is no safe harbor for the government in the fact that the Federal Rules of Evidence do not generally apply in

Given that the improperly excluded testimony was both plausible and significant in this case, the proper course was for the district court to admit the evidence and "give it such weight as his judgment and experience counsel." United States v. Matlock, 415 U.S. 164, 175 (1974).  In the written opinion, the district court simply said that there was "no evidence" of coercion and, while "[t]here may have been evidence" of coercion before the magistrate judge, "similar evidence was not reiterated in the hearing before the undersigned."[4]

In light of these missteps, and our inability to say they were harmless, we remand to a different district court judge to conduct a new suppression hearing.  See Sims, 385 U.S. at 544; see also Matlock, 415 U.S. at 177-78.  "Of course, if the [trial] court, at an evidentiary hearing, redetermines the facts and

suppression hearings, see United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002).  If anything, the inapplicability of the Federal Rules of Evidence provide further support for why Hortencia should have been permitted to testify about what she heard, because the evidence was clearly relevant.

[4] The government argues that any error in excluding Hortencia's testimony was harmless, because the judge found the police officers to be generally more credible than Feliz's mother and step-father.  But the district court did not find Feliz's family entirely incredible, and it did not make any finding or give any reason for why it would disbelieve them had they testified on the subject of the voluntariness of Feliz's confessions. Rather, it said there was no evidence of coercion.

decides that [Feliz's] confession was involuntary, there must be a new trial on guilt or innocence without the confession's being admitted in evidence."  Jackson, 378 U.S. at 394.

### III.

We vacate the order denying the motion to suppress, vacate the judgment of conviction, and remand for further proceedings consistent with this opinion.  Upon remand, the case shall be assigned to a different judge for a new proceeding.

So ordered.